ISRAEL F. TAPPAN *vs.* FREDERICK BURNHAM.

One who has gone upon an open beach and removed seaweed therefrom for a number of years, and during the same time has allowed other persons to enter upon it and remove seaweed, does not thereby acquire such a possession as will enable him to maintain an action for a trespass upon the same; especially against one who has entered under a license from the town, which, prior to the plaintiff's entry thereon, had been in possession of the same, and has never abandoned such possession.

The colonial grant of 1640, taken in connection with subsequent proceedings in 1642 and 1645, is sufficient to show that the title to the beach which was included therein vested in the town of Manchester; there being no evidence that the upland adjoining the beach was granted to any individual, prior to the colonial ordinance of 1647.

If, in an action to recover for breaking and entering the plaintiff's close, consisting of a beach and upland, it appears that the plaintiff has no sufficient title to the beach to enable him to maintain his action for a trespass thereon, and a general verdict is rendered for the defendant, a new trial will not be granted on exceptions, unless it affirmatively appears that the case was submitted to the jury under improper instructions in reference to his right to recover for a trespass upon the land to which he established a title.

TORT for breaking and entering the plaintiff's close in Manchester, consisting of upland and beach, and removing seaweed therefrom. The answer denied the plaintiff's title, and justified the alleged trespass under a license from the town of Manchester.

At the trial in the superior court, before *Vose*, J., the plaintiff's ownership of the upland was admitted; and he testified that at the time of the acts charged, in 1861, he was in possession of the beach described, and had been in possession thereof since 1847, supposing it to be his own; and that since then he had taken muck from it each spring and fall. He also testified on cross-examination that in 1823 he married the daughter of Benjamin Foster, who died in 1847; that he held the premises in the right of his wife in the estate of Benjamin Foster; that

Benjamin Foster was the son of Samuel Foster, who bought the premises of one Babcock; that he took possession of the beach by going upon it and taking muck or seaweed therefrom; that he had been upon it many years before 1847, and had taken muck there, but after that time took it in much larger quantities; that he did nothing else on the beach, except to take muck; and that when there from 1847 to 1854 he has seen other persons take muck from the beach, in the same manner that he did, though not more than once or twice in a season.

The defendant was allowed, against the plaintiff's objection, to introduce evidence to show that, for about fifty years prior to the acts complained of, various persons had been in the habit, nearly or quite every year, of going upon the beach and taking away seaweed therefrom, without objection from anybody, and without claim of title or right of possession; that from 1787 to 1861 the town by various votes and acts assumed the ownership and control of the beach; and that they sold the right to take muck therefrom in 1837, and from 1858 to 1861. It also appeared that there is a wall, called the new wall, extending from one end of the beach to the other, and that between this wall and the low water there is for a part of the distance the foundation of an old wall, which was removed about fifty years ago. For the purpose of proving that the plaintiff owns only to the beach, the defendant was permitted to put into the case, against the plaintiff's objection, the deed of Thomas Babcock to Samuel Foster, dated in 1787, and referred to by the plaintiff on cross-examination, in which the granted premises were described as bounded on the south " on land or the beach called Black Cove." There was much evidence as to the precise place where the acts of the defendant were done; and the defendant produced a license from the selectmen of Manchester to go upon the beach and take away seaweed in 1861. The defendant was also allowed, under objection, to introduce in evidence several reports of committees appointed by the town to lay out and renew the bounds of the public landing-places, and the roads to the same, for the purpose of proving title in the town, and of

showing that the town and the owners of the upland had agreed upon a conventional division line between them, different from the ordinary high water mark.

As further evidence of the town's title to the beach, the defendant was allowed, under objection, to put in evidence the following records: 1. A copy of a petition in 1640, taken from the town records. " Wee whose names are subscribed, belonging to the church & town of Salem, being straitned in our accomidations so that we are not able comfortably to subsist, having advised and taken councell about our present estate and condition, it being judged fitt & free liberty being granted us to remove, & no place being soe convenient for our easy removall as Jeffreyes Creek lying soe near us, & most of us having some small quantity of ground allowed to us there already, do therefore joyntly and humbly request the hon^{ed} court to give us power to erect a village there, and to allow us such enlargement thereabouts as is not granted to any other plantation. Thus leaving our request to y^r wisdom & consideration, with our prayer for a blessing from heaven on y^{re}    & proceedings, wee rest y^{re} humble petitioners." 2. Copies from the records of the general court.

"At a Generall Court of Elections, held at Boston, the 13th of the 3^{th} M^o, @ 1640. . . . . The petition of the inhabitants of Salem for some of their church to have Jeffryes Creeke, & land to erect a village there, for M^r Willi: Walton, John Blacke, Willi: Allen, Sam: Orchard, Geo: Norton, &c. comp^a; what land & inlargment may bee convenient, & is not granted to any other plantation, is granted them; & it is referred to M^r John Winthrope, Iunior, & M^r Symon Bradstreete, to settle the bounds of the said village." 1 Col. Rec. 288.

"A Gen^rall Co^rt, held at Boston, the 7th Day of the 8th M^o; 1640. . . . . . M^r John Winthrope, Iuni:, M^r Symon Bradstreete, M^r Ema: Downinge, M^r Hauthorne, & M^r Tynge, or any three of them, are appointed to set out the bounds between Ipswich, Jeffryes Creeke, & Cape Ann, & to certify to the next Courte." 1 Col. Rec. 304.

" 3^{th} 3^{th} m^o, 1642. Wee, whose names are under written, have

determined and agreed w^th the consent of Ipswich, Cape Ann, & Jefferies Creeke, that their bounds shall lye as followeth: That all the land lyinge between Ipswich & Cape Ann meeting house shall be divided, 6 miles to Ipswich & 4 miles to Cape Ann, where there are 10 miles, and so by proportion where less, — that is, by fifths, 3 parts to Ipswich for 2 to Cape Ann, — & where there is more than 10 miles, the remainder to lye to Jefferies Creeke, and this to be measured before the next Generall Court. William Hauthorne, Edward Hollioke, Matthew Boyes." 2 Col. Rec. 4.

"At a Co^rt of Election, at Boston, the 14th of the 3^th Month, @ 1645. . . . . . . It is ordered, y^t Jeffryes Creeke shal be called Manchester." 2 Col. Rec. 109.

After all the evidence was in, the judge stated that the evidence did not in his judgment show such an exclusive possession of the beach by the plaintiff, as against the defendant, as would enable him to maintain an action against the defendant for any acts done thereon, and that the questions to be submitted to the jury were, whether the defendant took muck above the ordinary high water mark, if that was found to be the line of division between the parties; or, if the parties had adopted a different line of division, then whether the defendant took muck above such line; and that it would be submitted to the jury to determine whether such line had been adopted; and he instructed the jury that the burden of proof was on the plaintiff to show where the alleged acts of trespass were committed; that, upon the evidence, the plaintiff owned to the ordinary high water mark, unless he and those under whom he claimed, and the owners of the beach, had adopted a different division line between them; that if such line had been adopted and assented to, then the plaintiff owned to that line, and could recover for any act of trespass above it; that upon the evidence the plaintiff had no such exclusive possession of the land below such division line as would enable him to maintain an action for acts of trespass done thereon by the defendant; and that the proceedings of the town for more than sixty years prior to 1847, assented to by the plaintiff and by those under whom he claims,

are evidence that the town was in exclusive and notorious possession of the beach, claiming title, during that time, and owned the fee of the beach in 1847.

Various other questions were raised during the trial, which ultimately became unimportant. The jury returned a verdict for the defendant, and the plaintiff alleged exceptions.

*J. C. Perkins,* (*D. P. Kimball* with him,) for the plaintiff.

*S. H. Phillips & J. A. Gillis,* for the defendant.

BIGELOW, C. J. The bill of exceptions in this case is very long, and contains much matter which is not relevant or material to the questions which were submitted by the court to the jury, and on which the decision of the case by them ultimately turned. In the aspect which the controversy finally assumed, under the ruling of the court, many of the objections taken by the plaintiff in the course of the trial became wholly unimportant. It seems to us that there are now only three points on which it is necessary for us to express an opinion.

1. The first arises on the ruling, made after all the evidence had been put in, that it did not appear that the plaintiff had such an exclusive possession of that portion of the *locus* lying below the line of ordinary high water mark, and constituting the beach in controversy, as to enable him to maintain an action of trespass for any act done thereon by the defendant. We see no reason to doubt the correctness of this view of the case, as it is disclosed by the evidence reported in the exceptions. It seems to us to be well supported on two grounds. In the first place, the evidence falls short of showing that the beach or any part thereof could in any just or legal sense be deemed the plaintiff's close. He does not show any exclusive, separate right in the soil, or any exclusive possession thereof. The premises were open and uninclosed. The tide ebbed and flowed over them twice every twenty-four hours. The plaintiff exercised no acts of ownership over them, and had no possession of them except to take muck or seaweed therefrom when it was thrown up by the action of the winds and waves. Besides, it appeared that during the whole period of the plaintiff's alleged possession and occupancy, and long prior thereto, many other persons had done similar acts

on the premises in controversy. But there was no evidence that the plaintiff ever claimed to own the soil. He did no act and made no claim except to go on and take the drift weed. It was not shown that he ever forbade others from exercising the same right. It seems to us that such temporary and occasional occupation of a shore or beach, without any proof that it was separate and exclusive, was insufficient to support the allegations in the plaintiff's declaration.

But there is a better and more decisive answer to the claim of the plaintiff to maintain this action. The defendant justifies his entry under a license from the town of Manchester. Upon the uncontradicted evidence in the case, it appears that the town was in possession of this beach, exercising acts of ownership and claiming the right to dispose of the seaweed or muck thereon, as early as the year 1837, long before the plaintiff's alleged possession and occupancy commenced. There is no evidence in the case to show that this possession by the town was ever relinquished or abandoned. The legal presumption, in the absence of proof to the contrary, is that it continued. And there was much evidence in the case which tended to show that the right of the town to the beach and to the drift weed which accumulated thereon was not only not waived or given up, but was continued and asserted up to the time of the commencement of this action. In this state of the evidence, the most favorable view which could be taken of the plaintiff's case was, that his possession was a mixed and concurrent one with that of the town. When he entered in 1847, the town were in possession of the premises. There is no pretence that his possession then became exclusive. The case, therefore, clearly comes within the principle, that where two parties have a concurrent or mixed possession of land, neither having other title or exclusive priority of possession, one of them cannot maintain an action of trespass against the other. *Brimmer* v. *Proprietors of Long Wharf,* 5 Pick. 131, 135. *Barnstable* v. *Thacher,* 3 Met. 239. The defendant could not be regarded as a stranger who had entered in violation of the right of the town as well as of the plaintiff. Under his license from the town, he had the

right of one holding a common occupation and possession with the plaintiff.

2. So far as a title to the beach in controversy was shown by documentary proof offered at the trial, it seems to us to be now vested in the town of Manchester. By the records of the general court, it appears that on the thirteenth day of May 1640, 1 Col. Rec. 288, the following vote was passed : " The petition of the inhabitants of Salem for some of their church to have Jeffryes Creeke, & land to erect a village there, for Mr Willi: Walton, John Blacke, Willi: Allen, Sam : Orchard, Geo : Norton, &c. compa ; what land & inlargment may bee convenient, & is not granted to any other plantation, is granted them ; & it is referred to Mr John Winthrope, Iunior, & Mr Symon Bradstreete, to settle the bounds of the said village." By subsequent votes and proceedings of the general court, to be found in 1 Col. Rec. 304, and 2 Ib. 4, 109, it appears that the territory included in the foregoing grant is the same as that now embraced in the town of Manchester. Looking at the terms of the vote, we think it clear that it was not a mere cession of jurisdiction or corporate authority to the person designated, over the territory therein named. It is in terms a grant of "land and inlargment" to divers persons and their associates, not to be held by them in severalty, but to them as proprietors, an aggregate body formed for the purpose of establishing a plantation or settlement, or, in the words of the petition, " to erect a village." It was in effect a grant to a proprietary, having certain corporate powers of a limited nature, by which they were enabled at the outset to manage, divide and alienate the lands amongst themselves, or to grant them to new settlers, and which subsequently, by usage or express grant, became enlarged into full municipal authority. This was the construction put on a similar vote of the general court in *Commonwealth* v. *Roxbury*, 9 Gray, 451, 496. And although the grant in this case preceded the colony ordinance of 1641–1647, Anc. Chart. 148, by which it was enacted that the proprietor of land adjoining " creeks, coves and other places about and upon salt water, shall have propriety to the low water mark " to the extent of one hundred rods, yet on the

passage of that ordinance the land in controversy became an-
nexed to the upland, so that it enured to the benefit of the town.
*Commonwealth* v. *Roxbury,* 9 Gray, 498. It did not appear at the
trial that the title to this beach, which thus became vested in
the town of Manchester, had ever been alienated or lost. In the
absence of evidence, the legal inference is that it continued in
the town. And there was evidence in the case which tended
very strongly to confirm this inference. On this point, the deed
of the adjoining upland from Thomas Babcock to Samuel Fos
ter in 1787, by which the land granted is bounded " on land
or the beach called Black Cove," thus excluding the grantee
from any right below ordinary high water mark, was competent
and significant evidence, in connection with the fact that no
conveyance of the beach by the town was shown to have been
made, that the title to it had never passed out of the town.

3. In the view which we have taken of the nature of the
plaintiff's possession of the beach, and of the title of the town
to the land below ordinary high water mark at the place in con-
troversy, the court did not err in ruling that the only question to
be determined by the jury was, whether the defendant took sea-
weed from the upland belonging to the plaintiff, or from a por-
tion of the beach which, by the establishment of a conventional
line between the town and the owner of the upland, might be
deemed to belong to the plaintiff as part of his upland, because
it was above the line fixed by the parties as the line of ordinary
high water. If the jury found this fact in favor of the plaintiff,
he was entitled to a verdict; and it was the only ground on
which this action could be supported. That it is competent for
adjoining owners to establish a line by agreement as the boun-
dary of their estates, which shall be binding on them and those
claiming under them, is too well settled to admit of a doubt.
Whether any such agreement was proved in the present case,
we cannot determine on this bill of exceptions, which does not
purport to contain a statement of all the evidence introduced at
the trial on this point. Nor can we see that the case was sub-
mitted to the jury under instructions which precluded the plain-
tiff from obtaining a verdict, if the evidence satisfied them

either that the defendant entered on the upland above the actual line of ordinary high water, or above the conventional line, if such line was proved to have been fixed and agreed on by the adjoining proprietors of the upland and beach.

*Exceptions overruled.*